*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 07-100-P-H* |
| | ) | |
| *SHAHEEN CURRY,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Shaheen Curry, charged with conspiracy to distribute and possess with intent to distribute five grams or more of a mixture or substance containing cocaine base, also known as crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, seeks to suppress statements he made and evidence seized following his arrest in a Wal-Mart parking lot in Scarborough, Maine on August 31, 2007. *See* Indictment (Docket No. 1); Motion To Suppress Statements and Physical Evidence, etc. ("Motion") (Docket No. 33).   An evidentiary hearing was held before me on January 16, 2008 at which the defendant appeared with counsel and at the conclusion of which counsel for both sides argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.

**I.  Proposed Findings of Fact**

In August 2007 Joshua Guay, a Scarborough, Maine police officer, was assigned to undertake surveillance of a woman (the confidential informant, or "CI") suspected to be involved in the distribution of Oxycontin.  On August 29, 2007 Guay arranged for a colleague in uniform to conduct a traffic stop of the CI's vehicle for illegal attachment of license plates.  After the stop, Guay questioned

1

the CI and obtained her consent to search the vehicle.  He found two pills that the CI said she believed contained methadone (which later were determined to contain morphine).  The CI offered to provide Guay with information regarding drug trafficking in exchange for his agreement not to arrest her that day.  He agreed.  Apart from that promise, Guay offered the CI, who had no criminal record, no money or other consideration in exchange for information.

The following day, Guay and Steven Thibodeau, a Scarborough police officer assigned to the United States Drug Enforcement Agency's ("DEA's") High Intensity Drug Trafficking Area Task Force, met the CI at her residence.  She offered to attempt to make a controlled purchase of crack cocaine from two black males from the Boston area, known to her only as "D" and "CJ," who she said were conducting a substantial drug-trafficking business in southern Maine.  She told the officers that she had purchased crack cocaine from the men previously, that one was heavyset and the other skinny – although she did not know which was which – and that she typically ordered the crack cocaine by dialing the number 207-321-1015.

She then dialed that number and got voice mail, which she told the officers meant that D and CJ were working in the area.  She called twice more, finally reaching a person whom she identified as D, who told her that he was going to Massachusetts and would be back the following day.  The CI told D she wanted an "O," which Guay understood to mean an ounce of crack.  The call to D was not recorded because the batteries in Thibodeau's tape recorder were dead.

On August 31, 2007 Guay and Thibodeau again met with the CI, who accompanied them to the Scarborough police station.  She made a total of six phone calls to the number 207-321-1015, all of which were recorded, and all of which she said were with CJ.  In the first two calls, the man she identified as CJ agreed to sell her twenty-four grams of cocaine for $1,800.  In the third call, the two agreed to meet at the Wal-Mart on Payne Road in Scarborough, with the CI offering to cover the cost

2

of a cab to take CJ there.  The delivery was expected to take place in the evening, sometime between 7 and 7:30 p.m.  Guay and Thibodeau arranged for at least five other police officers, each in a separate vehicle, to set up surveillance at various locations around the Wal-Mart parking lot.  Each was briefed and told to expect a black male by the name of CJ, possibly accompanied by a second black male, to arrive by taxi.  Guay and Thibodeau asked the CI to inform them immediately when she identified D or CJ.

During the final three calls – placed from a police vehicle in the Wal-Mart parking lot in which the CI, Guay and Thibodeau were seated – the CI checked on CJ's progress, urged him to hurry and finalized details of their meeting.  In the sixth and final call, CJ told the CI he would be arriving in an ABC taxi.  Within two minutes after the call ended, an ABC taxi pulled up near the front entrance to the Wal-Mart.  Guay observed two black males generally fitting the description given by the CI exit and begin to look around the parking lot.  The CI said: "That's them."  Thibodeau asked whether she was sure, and she repeated: "That's them."  A verbal order to arrest the two suspects was given and transmitted via radio to all participating officers.

Guay, who was wearing a black vest emblazoned with the word "police" in white letters over his plainclothes and had his Scarborough police identification badge hanging from a chain around his neck, left his vehicle and approached the black male later identified as Shaheen Curry (hereafter, "the defendant").  Guay, who had his service weapon drawn at "low ready," pointing downward, shouted at the defendant several times to get on the ground.  The defendant did not comply, instead adopting what Guay perceived as a fighting stance – crouching down, putting both hands up in the air and clenching his fists.  Another officer, DEA agent Ernest MacVane, tackled the defendant from behind, whereupon both Guay and MacVane succeeded in handcuffing him.  When MacVane tackled the defendant, Guay observed one cell phone fall to the ground underneath the defendant and a second cell

3

phone dangle halfway out of the defendant's pocket. After the defendant was handcuffed, Guay retrieved both phones – one of which was a Motorola and one of which was a Verizon LG – and held onto them until another officer brought him a plain brown paper evidence-storage bag similar to a lunch bag. Guay then placed the two phones in the paper bag.

At about the same time as MacVane and Guay were arresting the defendant, Scarborough police officer John Gill chased and tackled to the ground the second male, later identified as Durrell Curry ("Durrell"). DEA agent Paul Wolf, who had also given chase when he saw Durrell attempting to flee, assisted Gill in handcuffing Durrell, patting him down for weapons and standing him back up. Gill placed Durrell's belongings in another brown paper bag.

The defendant and Durrell were arrested on a Friday night. Wal-Mart was open for business at the time, its large parking lot was nearly full, and there was heavy vehicular and foot traffic in and out of the parking lot and the store. Immediately after the arrests, a small crowd gathered, and people began to hoot and holler. Police vehicles were disrupting the flow of traffic into the Wal-Mart parking lot from Payne Road. From the point of view of Guay and/or Wolf, these circumstances presented concerns for the safety of police and of the defendants, possible disruption of evidence and general disruption to Wal-Mart's business. Although officers typically transport arrestees in a marked cruiser with a cage, Sergeant O'Malley[1] of the Scarborough Police Department ordered that these arrestees be transported immediately to the Scarborough police station in one of the unmarked police vehicles then on the scene. Within ten to fifteen minutes of their arrests, the defendant and Durrell were driven away from Wal-Mart. Guay served as one of the transporting officers.[2] Other officers separately drove to

---

[1] Sergeant O'Malley's first name was not provided.
[2] While Guay conceded, on cross-examination, that he could have retreated to one of the six police vehicles spread around the Wal-Mart parking lot to conduct an immediate search of the recovered cell phones' contents, he testified persuasively that this would not
*(continued on next page)*

the station – a two- to three-mile drive that took approximately five minutes.

On or soon after Guay's arrival at the station he met MacVane and Wolf, who took charge of the arrestees to begin the identification and interview process.  Guay also met up with Gill, who gave him a paper bag containing items he said he had seized from Durrell.[3]  MacVane began to question Durrell in the station's lunch room, while Wolf began to question the defendant in a first-floor interview room.  Guay took the paper bags containing the cell phones to the so-called "Reports Room," a long, narrow room used by officers to write reports and bag evidence, in which three computers are arrayed along a long work desk.  Only a few minutes had transpired since Guay first arrived at the station.  Guay placed the bags on opposite ends of the work desk and began to search the cell phones' contents for evidence of drug trafficking.  Guay neither obtained consent to undertake that search nor sought a warrant to do so.  While Guay was so engaged, Wolf was trying to identify the defendant, who denied possessing any identification cards and initially provided Wolf with a name and date of birth that Wolf was unable to verify via a search of Massachusetts records.

In the Reports Room Guay ascertained, either by pressing buttons to access the "My Settings" feature, by using the phone to make a call or both – that the phone number (207) 321-1015 belonged to the Motorola cell phone seized from the defendant.  Upon learning this, he walked to the threshold of the first-floor interview room, possibly with the Motorola cell phone in his hand, leaned in and asked Wolf how things were going.  Wolf said, "Not well."  Guay told Wolf that was okay because the defendant, whom Wolf was interviewing, had a "dirty phone" on him.  Guay directed no comments or questions to the defendant.  However, the defendant spoke up, saying something to the effect: "That's

---

have been practical given the hectic scene at Wal-Mart and the decision to remove the defendants immediately.

[3] On cross-examination, Guay testified that there was some small possibility he received the paper bag from Gill at the scene of the arrest and transported both bags back to the police station.  However, he thought it more probable that he received the bag from Gill

*(continued on next page)*

not my phone. That was on the ground at Wal-Mart." The only questions Wolf asked the defendant during his stationhouse interview of him that evening were questions related to identity. Wolf gave the defendant no *Miranda* warnings during that interview.[4]

After Guay completed his search of the phones, he placed the two phones recovered from the defendant in a manila-envelope evidence bag, sealed it at the top with his initials, and filled in blank lines seeking information including the case number, evidence description, date and time of recovery, location of recovery and name of the arrestee. *See* Gov't Exh. 5. He destroyed the brown paper bag in which he had initially stored the two phones. He also completed a Scarborough Police Department Continuity of Evidence Form listing one Motorola cell phone and one Verizon LG cell phone as items taken from the person of the defendant. *See* Gov't Exh. 4. He placed items that Gill had given him in a second manila-envelope evidence bag, sealed it at the top with his initials and filled in blank lines. *See* Gov't Exh.7. He also completed a Scarborough Police Department Continuity of Evidence Form listing, *inter alia*, one Motorola cell phone as among items associated with Durrell. *See* Gov't Exh. 6.[5] While, in his Continuity of Evidence forms, Guay did not note any differences between the two Motorola cell phones, the two phones are not identical in appearance. The Motorola phone attributed to the defendant is black, while that attributed to Durrell is a gray- or silver-faced flip phone. At no time between seizure of evidence at the scene of arrest and placement of that evidence in manila-envelope evidence bags at the Scarborough police department did Guay commingle the two cell

---

at the police station. I credit the more probable version of events.

[4] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

[5] The manila-envelope evidence bags have been opened on two occasions, under the supervision of a detective, since Guay sealed them on August 31, 2007 – once to permit defense counsel to review the contents and once to allow Guay to photograph the cell phones contained therein. On each occasion, the supervising detective opened the bags in a new spot, resealed them and wrote his *(continued on next page)*

6

phones recovered from the defendant with that recovered from Durrell.

Among the officers summoned to the Wal-Mart on the evening of August 31, 2007 was Maine Drug Enforcement Agency ("MDEA") agent Kevin Cashman.  Shortly after the defendant and Durrell were taken into custody, Cashman interviewed the driver of the ABC taxi who had transported them to Wal-Mart, learning that the driver had picked them up in front of Room 225 of the Travelodge in Portland, Maine.  Cashman and fellow MDEA agent Scott Durst went to the Travelodge, where they ascertained that Room 225 was not rented to anyone but that Room 219 had been rented to "Shaneen" Curry.  Cashman made arrangements to secure Room 219 so that no one could enter it, left Durst at the Travelodge and set about the task of seeking a warrant to search the room.  He prepared a search-warrant affidavit in which he listed, *inter alia*, the following as supplying probable cause to search the motel room for cocaine base, business records related to drug trafficking, drug paraphernalia, sums of money obtained from the sale of scheduled drugs, firearms and other types of weapons, police scanners and identity evidence:

1.      On August 31, 2007 at approximately 6:49 p.m. he received a phone call from Thibodeau informing him that:

       A.      Thibodeau was with a CI who was providing information for consideration on a pending motor-vehicle charge.  Affidavit and Request for Search Warrant ("Affidavit"), contained in Gov't Exh. 8, at 3.  The CI had provided Thibodeau with information concerning drug trafficking in the Greater Portland area that was consistent with Thibodeau's own information or corroborated by other informants.  *Id*.

       B.      The CI had made several recorded phone calls (321-1015) to two individuals the CI knew as "D" and "CJ" from whom the CI said he/she had purchased cocaine base several times in the recent past.  *Id*.  During these conversations, D and CJ told the CI they would travel to the Scarborough Wal-Mart from Westbrook in an ABC taxi and sell the CI one ounce of cocaine base.  *Id*.

---

initials over the new seal.  *See* Gov't' Exhs. 5, 7.

C.      When the ABC taxi arrived in front of the Wal-Mart, two black males exited the cab. *Id*. The CI told Thibodeau: "That's them there." *Id*. Police then approached the males and identified themselves. *Id*. One male, later identified as Shaneen Curry, assumed a fighting stance. *Id*. He was subsequently taken to the ground and detained. *Id*. The other male, later identified as Durrell Curry, attempted to flee. *Id*. He, too, was taken to the ground and detained. *Id*. A search of Durrell Curry's person revealed a large quantity of suspected cocaine base. *Id*. Both subjects had approximately $40 on their persons, and Shaneen Curry was in possession of the telephone that the CI had called (321-1015). *Id*. Thibodeau also said one of the males had a hotel swipe key on his person. *Id*. The key did not have the hotel's name on it. *Id*.

2.      At approximately 7:30 p.m. Cashman arrived at the Wal-Mart in Scarborough. *Id.* He observed that agents and members of the Scarborough Police Department had detained two males. *Id.* He was told that these males had arrived in an ABC taxi. *Id*. He spoke with the cab driver, who told Cashman that he had picked up the two males in front of Room 225 of the Travelodge in Portland. *Id*. at 3-4. The driver told Cashman that after picking the males up, he drove directly to the Wal-Mart in Scarborough. *Id*. at 4. Cashman also spoke to Thibodeau, who told Cashman that Durrell Curry had a large quantity of suspected cocaine base on his person and that Shaneen Curry had a motel-room key on him. *Id*. Thibodeau later told Cashman that he (Thibodeau) watched Guay conduct a chemical field test on the suspected cocaine base, which tested presumptively positive for the presence of cocaine. *Id*.

3.      Durst and Cashman went to the Travelodge in Portland. *Id*. Cashman spoke with the Travelodge clerk, who provided him with a copy of the guest registration list. *Id*. The list showed that Room 219 was rented to Shaneen Curry from August 28 through September 1, 2007. *Id*.[6] Cashman asked the clerk if anyone was in Room 225. *Id*. She said the room was not usable and was not rented

---

[6] Elsewhere on this page of his affidavit, Cashman states that the guest list showed that the renter of the room was "Shaneen Durrell." Affidavit at 3. This likely is a typographical error.

to anyone.  *Id*.  Cashman knew, based on his training, education and experience, that persons engaged in drug trafficking often use taxis to conduct drug transactions and that they often are picked up at locations near where they actually are staying in order to confuse law enforcement as to their actual residence or current abode.  *Id*.

4.      Cashman watched the Travelodge clerk make a call to Room 219.  *Id*.  No one answered.  *Id*.  Durst and Cashman then went to Room 219.  *Id*.  Cashman could see that the lights and the television were on and the blinds were not completely shut.  *Id*.  Durst told Cashman he could see inside the room from the exterior of the hotel, and he saw no one inside.  *Id.*  As of the time of the writing of the affidavit, Durst was conducting surveillance on Room 219 and had Travelodge staff "lock out" the room, prohibiting anyone from entering it.  *Id*.

5.      At approximately 9 p.m., Cashman spoke with MacVane, who told Cashman he had interviewed Durrell Curry, who told him (after being informed of his *Miranda* rights and signing a written waiver of them) that he traveled by bus on August 31, 2007 to Maine from Massachusetts, he was in possession of approximately one ounce of cocaine base during his trip, he arrived at the Travelodge and met with his cousin, Shaneen Curry, he observed a digital scale and a crack pipe in the motel room, he had given his cousin some of the crack to smoke, he subsequently went to the Wal-Mart in Scarborough to sell crack to a person, and the cocaine base found on him belonged solely to him.  *Id*.

6.      Cashman later spoke with Thibodeau, who told him that he had learned from Wolf that Shaneen Curry refused to give consent to search the hotel room and refused to answer questions. *Id*.

The warrant was issued by a justice of the peace at 10:59 p.m.  *See* Search Warrant, contained in Gov't Exh. 8, at 4.  An ensuing search of the room yielded items that included a digital scale with residue that field-tested presumptively positive for cocaine, sums of cash, an identification card

belonging to the defendant and corner-cut baggies.  *See* Gov't Exh. 9.

## II.  Discussion

In his motion, the defendant argues that officers impermissibly:

1.      Interrogated him regarding his possession or ownership of a cell phone either without a requisite *Miranda* warning or after he had invoked his right to remain silent.  *See* Motion at 4-5.

2.      Searched the contents of seized phones without a warrant or consent.  *See id.* at 5-7.

3.      Used the illegally obtained phone number to obtain a warrant for search of his motel room.  *See id.* at 7-8.

4.      Commingled the two Motorola telephones, as a result of which officers have established ownership only through use of the improperly obtained statement.  *See id.* at 8-9.

At hearing, counsel for the government identified three categories of statements made by the defendant: (i) those concerning date of birth and identity, (ii) those uttered regarding the Motorola cell phone, and (iii) those elicited in response to questions regarding the defendant's relationship with Durrell.  Counsel for the government clarified that the government will not seek to introduce the third category of statements – that is, statements elicited in response to questions regarding the defendant's relationship with Durrell.  Defense counsel conceded that the first category of statements – those elicited in response to questions regarding identity – are admissible pursuant to the so-called "booking exception" to the *Miranda* rule, which "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services."  *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation and internal quotation marks omitted).  Counsel for the government asked the court to rule on the appropriateness of the second category of statements – the defendant's comments regarding the Motorola cell phone – inasmuch as the government does seek to introduce those statements at trial.

## A.  Admissibility of Statements Regarding Cell Phone

"*Miranda* warnings must be given before a suspect is subjected to 'custodial interrogation.'" *United States v. Taylor*, 985 F.2d 3, 7 (1st Cir. 1993).  "'Interrogation' includes not only the asking of direct questions but also means any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. (citation, footnote and internal punctuation omitted); *see also, e.g., Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express  questioning or its functional equivalent.  That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (footnotes omitted).  By contrast, a voluntary utterance – uncoerced by direct questioning or its functional equivalent – does not implicate the protections of *Miranda*.  *See, e.g., United States v. Shea*, 150 F.3d 44, 48 (1st Cir. 1998), *recognized as abrogated on other grounds, United States v. Mojica-Baez*, 229 F.3d 292 (1st Cir. 2000) ("No evidence suggests that the FBI coerced Shea into making these statements.  Indeed, the record shows that all of these statements were spontaneous utterances, which we deem to be admissible.").

The statements made by the defendant to the effect that the Motorola cell phone was not his and had been on the ground at Wal-Mart were not elicited in response to direct questioning.  The defendant has not argued, either in his papers or at hearing, that they were elicited in response to the functional equivalent of direct questioning.  Nor do I find that to have been the case.  In *Innis*, the Supreme Court deemed a brief conversation between two patrol officers transporting a murder suspect to the police station not to have constituted "interrogation" for purposes of *Miranda* when the officers expressed

11

concern that the murder weapon, a gun, might be discovered by and cause harm to disabled children attending a nearby school. *See Innis*, 446 U.S. at 294-95. Upon overhearing this, the suspect interrupted the conversation and offered to take officers to the location of the gun. *See id*. at 295. Noting that nothing in the record suggested that the officers were aware the suspect was peculiarly susceptible to an appeal to his conscience concerning the safety of disabled children or unusually disoriented or upset at the time of his arrest, *see id*. at 302-03, the Court concluded:

> The case . . . boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative."

*Id*. at 303.

Here, as in *Innis,* the officers' conversation was brief, and there is no evidence that officers were aware or should have been aware that the defendant was unusually disoriented, upset or suggestible. The defendant's remark was not coerced; rather, it was a spontaneous, voluntary utterance. Accordingly, it is not suppressible on *Miranda* grounds.

### B. Search of Cell-Phone Contents

The defendant next challenges Guay's warrantless search of the two cell phones attributed to him, asserting that (i) he has standing to complain of that search, (ii) individuals harbor a reasonable expectation of privacy in the contents of their cell phones, and (iii) the search was not a permissible search incident to arrest. *See* Motion at 5-7. The government does not take issue with the notion that individuals harbor a reasonable expectation of privacy in the contents of their cell phones; however, it rejoins that (i) the defendant lacks standing to challenge the search of the cell phone in which he

disclaimed an ownership interest and, (ii) in any event, Guay's examination of the cell phones' contents constituted a valid search incident to arrest. *See* Government's Consolidated Objection to Defendants' Motions To Suppress Evidence and Defendant Shaheen Curry's Motion To Sever, etc. ("Response") (Docket No. 44) at 10-13.

At hearing, defense counsel argued that his client indeed had standing to challenge search of the Motorola phone inasmuch as, *inter alia*, the purported disclaimer postdated the search of the phone's contents. Defense counsel is correct. Disclaimer of an interest in property is a recognized basis for loss of standing to mount a Fourth Amendment challenge to the seizure or search of that property. *See, e.g., United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990) ("A voluntary denial of ownership demonstrates sufficient intent of disassociation to prove abandonment."); *United States v. Miller*, 589 F.2d 1117, 1131 (1st Cir. 1978) ("[O]ne who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private."). Nonetheless, the timing of such a disclaimer matters: It is effective only as to a subsequent search or seizure of the item. *See, e.g., United States v. O'Brien*, 498 F. Supp.2d 520, 535 (N.D.N.Y. 2007) ("When assessing whether police reasonably seized a disclaimed item, the critical issue is whether a suspect took action to protect his privacy interest at the time of the seizure, not whether he expressed a contrary position at some later time."); *United States v. Doe*, 786 F. Supp. 1073, 1080 (D.P.R. 1991) ("In a disclaimer context, the issue is whether the defendant has voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.") (citation and internal quotation marks omitted). In this case, the defendant had not disclaimed ownership of the Motorola cell phone (or relinquished his privacy interest in its contents) at the time of the challenged search. He therefore retains standing to challenge that search.

13

I turn to the question whether Guay's search was a valid search incident to arrest.  The government urges the court to follow the lead of *United States v. Finley*,  477 F.3d 250 (5th Cir. 2007), in which the United States Court of Appeals for the Fifth Circuit held valid a search of the contents of a cell phone seized from the defendant at a traffic stop but examined at the home of a co-defendant to which the defendant was transported following his arrest.  *See, e.g.*, Response at 11-13; *Finley*, 477 F.3d at 254.  The *Finley* court reasoned: "The fact that the search took place after the police transported Finley to Brown's residence does not alter our conclusion.  In general, as long as the administrative processes incident to the arrest and custody have not been completed, a search of effects seized from the defendant's person is still incident to the defendant's arrest."  *Id*. at 260 n.7 (citations omitted).  In so holding, the *Finley* court relied on *United States v. Edwards*, 415 U.S. 800 (1974), in which the Supreme Court validated, as a search incident to arrest, a jailhouse seizure and search of the defendant's clothing approximately ten hours after his arrest, when jail authorities finally were able to provide substitute clothing for him.  *See id.; see also Edwards*, 415 U.S. at 801-02.  The Court observed: "[B]oth the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence."  *Edwards*, 415 U.S. at 803 (footnote omitted).

The defendant, by contrast, relies on *United States v. Park*, No. CR 05-375 SI, 2007 WL 1521573 (N.D. Cal. May 23, 2007), and *United States v. Lasalle*, Cr. No. 07-00032 SOM, 2007 WL 1390820 (D. Haw. May 9, 2007), for the proposition that a search of a cell phone that occurs in the field as part of an arrest is distinguishable from a post-arrest search at the police station.  *See* Motion at 6-7.  In the latter situation, the defendant reasons, there is no issue of officer safety, flight, destruction of evidence or other exigency justifying an exception to the warrant requirement.  *See id.* at 7.

14

The *Park* court did indeed criticize and decline to follow *Finley* insofar as *Finley* analogized cell phones seized from a defendant's person to personal effects (such as clothing, wallets and pagers) that remain searchable "incident to arrest" through such time as the administrative processes incident to custody and arrest are completed.  *See Park*, 2007 WL 1521573, at *8; *see also Finley*, 477 F.3d at 259-60 & n.7.  The *Park* court deemed cell phones analogous instead to possessions within an arrestee's control (such as closed containers or luggage) that lawfully may be searched without a warrant only if the search is "substantially contemporaneous" with the arrest.  *See Park*, 2007 WL 1521573, at *6, *8-*9 (relying in part on *United States v. Chadwick*, 433 U.S. 1 (1977)).[7] Nonetheless, the *Park* court distinguished *Finley* not only on the basis of doctrinal disagreement but also on the facts: Whereas "in *Finley* the search of defendant's cell phone at the passenger's residence was 'substantially contemporaneous' with the defendant's arrest[,]" in *Park*, the search of the cell phone, which had been seized during the booking process more than an hour and a half after the arrest, was not.  *Id*. at *8 & n.8, *9.

Like the *Park* court, the *Lasalle* court deemed the rule of *Edwards* inapplicable to cell phones seized from a defendant's person – although the *Lasalle* court did not mention *Finley*.  *See Lasalle*, 2007 WL 1390820, at *6.  Nonetheless, the *Lasalle* court acknowledged:

> When the *Edwards* exception does not apply, a search incident to arrest must be conducted at about the same time as the arrest.  There is no fixed outer limit for the

---

[7] The Court in *Chadwick* invalidated a warrantless search of a locked footlocker undertaken an hour and a half after the defendants were arrested and the footlocker was seized from the trunk of a parked car in which the defendants had placed it just prior to their arrests.  *See Chadwick*, 433 U.S. at 4.  Both the defendants and the footlocker were transported from the scene of arrest – a train station – to a federal building, where the footlocker was searched without a warrant or consent. *See id.* at 4-5.  The Court reasoned: "[W]arrentless searches of luggage or other property seized at the time of arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest or no exigency exists." *Id.* at 15 (citation and internal quotation marks omitted).  The Supreme Court later abrogated *Chadwick* with respect to closed containers found within automobiles.  *See California v. Acevedo*, 500 U.S. 565, 580 (1991).  However, *Chadwick* remains good law as to property seized in other circumstances.  *See, e.g., United States v. Doe*, 61 F.3d 107, 111 n.6 (1st Cir. 1995) ("*Chadwick* has been overruled only as to closed containers seized from inside an automobile.") (emphasis omitted).

15

number of minutes that may pass between an arrest and a valid warrantless search that is a contemporaneous incident of the arrest.  Instead, courts have employed flexible standards such as "roughly contemporaneous with the arrest" and within "a reasonable time" after obtaining control of the object of the search.

*Id*. (citations and internal quotation marks omitted).  The *Lasalle* court concluded that the cell-phone-content search in question was not substantially contemporaneous with the defendant's arrest inasmuch as the search had transpired between two hours and fifteen minutes and three hours and forty-five minutes after arrest at a location a few miles distant from the arrest locale.  *See id.* at *7.

In the circumstances of this case, it is not necessary to determine whether the Supreme Court and/or the First Circuit more likely would be swayed by the reasoning of *Finley* that a cell phone seized from a person is analogous to a personal effect (that is, that the *Edwards* exception applies) or that of *Park* and *Lasalle* that such phones should be deemed possessions within an arrestee's immediate control (like the footlocker in *Chadwick*).  The instant search is not materially distinguishable from that at issue in *Finley*, which even the *Park* court recognized constituted a search substantially contemporaneous with a defendant's arrest.  Here, as in *Finley*, the phones were seized in the field at the time of arrest (at a traffic stop in *Finley*; at the Wal-Mart in this case).  Here, as in *Finley*, officers transported the defendant to another location where the phone-content search was undertaken.  *Finley* does not make clear approximately how much time elapsed from the time of arrest to the search, *see Finley*, 477 F.3d at 254; however, unlike the search in *Park*, which occurred more than an hour-and-a-half after arrest, or the search in *Lasalle*, which occurred as much as three hours and forty-five minutes after arrest, the instant search was performed within less than a half hour after the defendant's arrest.  Moreover, the search in this case was performed reasonably promptly, and reasonably close to the scene of arrest, in view of the circumstances. The arrest of the defendant and Durrell was creating something of a scene at a busy, crowded Wal-Mart on a Friday night in

16

summertime.  Officers had found it necessary to block the front entrance to the store, and a small crowd was gathering and beginning to hoot and holler.  The situation was such as to persuade arresting officers to bend their customary rule of using a marked, caged cruiser to transport suspects.  They immediately whisked the defendant and Durrell away in an unmarked police vehicle.  As soon as reasonably possible at the stationhouse – once other officers had taken custody and control of the arrestees – Guay conducted the cell-phone-content searches in issue.  In the light of the circumstances, the search undertaken by Guay at the Scarborough police station remained "substantially contemporaneous" with the defendant's arrest.  Therefore, even assuming *arguendo* that the *Edwards* exception does not apply, the cell-phone-contents search in issue constituted a lawful search incident to arrest.

### C.  Search-Warrant Challenge

The defendant next argues that, with the illegally obtained cell-phone number expunged from the search-warrant affidavit, the affidavit fails to supply probable cause for the search of the Travelodge.  *See* Motion at 7-8.  The conclusion that the cell-phone-contents search was valid disposes of this point.  Nonetheless, even assuming *arguendo* that the cell-phone number was illegally obtained, suppression of the fruits of the  motel-room search remains unwarranted for the two alternative reasons proffered by the government: that, even with the reference to the defendant's possession of the cell phone bearing the number (207) 321-1015 expunged, the affidavit continues to convey probable cause for the motel-room search, and, in any event, the *Leon* good-faith exception applies.  *See* Response at 15-18; *see also United States v. Leon*, 468 U.S. 897, 922-25 (1984).

A defendant bears the burden of proving the illegality of a warrant; if he succeeds, the burden shifts to the government to prove entitlement to the *Leon* good-faith exception.  *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir.1985) ("The general federal rule on who bears the burden of

proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant.").

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted). Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause. *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996). "Yet such review cannot start from scratch. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id.* (citation and internal quotation marks omitted).

"In determining whether the nexus element is satisfied, a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Ribeiro*, 397 F.3d at 48-49 (citation and internal punctuation omitted). "Put differently, the application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched." *Id.* at 49 (citation and internal quotation marks omitted).

"[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a

reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005); *see also, e.g., United States v. Woodward*, 173 F. Supp.2d 64, 67 (D. Me. 2001), *aff'd*, 43 Fed. Appx. 397 (1st Cir. 2002) ("When a court reviews an affidavit from which unconstitutionally seized evidence has been excised, it must independently determine if such probable cause remains within the affidavit that a neutral magistrate would have issued the subject warrants.") (citation omitted).[8]

The defendant posits that  when reference to his possession of the cell phone bearing the number (207) 321-1015 is expunged from the Cashman affidavit, the "nexus" element is unsatisfied inasmuch as (i) the motel room was registered to him, not to Durrell, (ii) Durrell claimed he was the only one responsible for the crack cocaine found on his person, (iii) no contraband was found on the defendant's person, (iv) there was no evidence tying Durrell to the motel room, and (v) nothing linked the defendant to the CI apart from the reference to the defendant's possession of the cell phone bearing the number the CI had called.  *See* Motion at 8.  Nonetheless, as the government argues, *see* Response at 15-16, even in the absence of that cell-phone information the affidavit continues to convey a fair probability that evidence of the crime of drug trafficking will be found in Room 219 of the Travelodge inasmuch as it makes clear that:

1.      The CI described purchasing cocaine base in the past from two black males working in tandem.

2.      In arranging purchase of an ounce of cocaine base, the CI said that she spoke on August 30, 2007 to one of those individuals, D, and on August 31, 2007 to the other one, CJ.

---

[8] The First Circuit has left open the question whether any deference should be paid to an issuing magistrate's determination of probable cause in circumstances in which the reviewing court expunges information from a search-warrant affidavit after the fact.  *See Dessesaure*, 429 F.3d at 368 n.8.  Here, as in *Dessesaure*, I have given the defendant the benefit of the rule favorable to him and have *(continued on next page)*

3.      The CI expected one or both men to arrive by ABC taxi at the Wal-Mart.  Two black males indeed exited an ABC taxi at the Wal-Mart and began to look around, at which point the CI declared: "That's them."  One of the males, Durrell, was found in possession of a quantity of crack cocaine.

4.      Cashman learned from the taxi driver that the driver had picked up both men outside Room 225 at the Travelodge in Portland.

5.      Cashman discovered from the Travelodge clerk that no one was staying at Room 225 but that a "Shaneen Curry" had rented Room 219.  He knew from his training and experience that those involved in drug trafficking often use taxis to conduct drug trafficking and often arrange to be picked up at locations near where they are staying to confuse officers as to their actual residence or abode.

6.      In his confession, Durrell reported that he had traveled to Portland and met his cousin, Shaheen Curry, at the Travelodge in Portland.  He described having seen a digital scale and a crack pipe in his cousin's motel room.

Even with the contested information expunged, the affidavit conveys reason to believe that the defendant and Durrell – both positively identified by the CI at the Wal-Mart – were working in tandem to sell crack cocaine and that the Travelodge room the defendant had rented, which Durrell confirmed he had visited and described as containing a digital scale and a crack pipe, contained evidence of the crime of cocaine trafficking.

In any event, the government alternatively invokes the *Leon* good-faith exception.  *See* Response at 17-18.  Pursuant to *Leon*, "[e]vidence seized in violation of the Fourth Amendment is admissible in court if the government placed an objectively reasonable reliance on a neutral and

---

not relied on any presumption in favor of the correctness of the decision to issue the warrant based on the Cashman affidavit as
*(continued on next page)*

detached magistrate judge's incorrect probable cause determination." *United States v. Crosby,* 106 F. Supp.2d 53, 58 (D. Me. 2000), *aff'd*, 24 Fed. Appx. 7 (1st Cir. 2001) (citation and internal quotation marks omitted).  The *Leon* exception is itself subject to exceptions:

> There are four exclusions to the *Leon* good-faith exception: (1) when the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient – i.e. in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999) (citation and internal punctuation omitted).

 At hearing, defense counsel argued that *Leon* was inapplicable because Guay elected not to obtain a warrant to search the cell phones' contents even though he was aware that such a warrant could be obtained.  That sort of "willful blindness" undercuts a showing of good faith for *Leon* purposes, defense counsel posited.  Nonetheless, Guay testified that he believed the search he undertook was a valid search incident to arrest.  In the circumstances, a reasonable officer could have so concluded; the judgment was at most mistaken, not reckless or willfully blind.  In any event, there is no reason to believe that Cashman – the affiant – knew or should have known that Guay's search was improper. The *Leon* good-faith exception accordingly applies.

For any or all of the foregoing reasons, the defendant's bid to suppress evidence obtained pursuant to the warrant to search Room 219 of the Travelodge should be denied.

### D.  Commingling of Cell Phones

The defendant finally asserts that officers commingled the two Motorola cell phones seized at the time of arrest, undercutting the validity of officers' and the government's attribution of the cell

---

originally presented.  *See id.*

phone number 207-321-1015 to the defendant and requiring suppression of the phones themselves. *See* Motion at 8-9.  Nonetheless, I am satisfied, based on the evidence adduced at hearing, that the phones were not commingled.  Guay personally removed a Motorola and a Verizon LG cell phone from on or near the person of the defendant at the time of his arrest.  He held the two phones until he obtained a plain brown paper bag in which to store them.  He kept that bag in his possession at all times through his search and subsequent packaging of the contents into a sealed evidence envelope. Although he took custody, most likely at the police station, of a second plain brown paper bag containing effects seized from Durrell's person, he testified that he put the two bags at opposite ends of his work table in the evidence room prior to undertaking the cell-phone-content search.  Further, although both bags were unmarked, there were differences between them – for example, one bag contained two cell phones while the other contained only one.  Moreover, there were differences between the two Motorola phones: One was black, while the other was a gray- or silver-faced flip phone.  Even had Guay mixed up the bags – which I find he did not – he would have been able to distinguish the two Motorola phones.

### III.  Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the Motion be **DENIED**.

### *NOTICE*

**A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.**

***Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.***

Dated this 23rd day of January, 2008.

<u>/s/ David M. Cohen</u>
David M. Cohen
United States Magistrate Judge

23